(C.D. 2355)

HOLDWIRE, LTD. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided July 23, 1962)

*Michael Stramiello, Jr.*, for the plaintiff.

*Joseph D. Guilfoyle*, Acting Assistant Attorney General (*Henry J. O'Neill* and *Richard H. Welsh*, trial attorneys), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges; LAWRENCE, J., not participating

RAO, Judge: Certain imported steel tying wire was assessed with duty at the compound rate of 9½ per centum ad valorem and $\frac{1}{10}$ cent per pound, pursuant to the provision in paragraph 316 of the Tariff Act of 1930, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, 91 Treas. Dec. 150, T.D. 54108, for round iron or steel wire, valued at over 6 cents per pound, and galvanized (T.D. 51802, *infra*).

It is the claim of the plaintiff that the wire specified in invoices 791 and 795 of entry number 836866, covered by the instant protest, is dutiable at only ¼ cent per pound within the provision of paragraph 317 of said act, as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T.D. 51802, for all wire, commonly used for baling hay or other commodities.

All other claims as to all other merchandise have been abandoned.

This case has been submitted for decision upon a record which includes the testimony of the president of plaintiff corporation and the testimony of three witnesses for the defendant, all employees of various divisions of United States Steel Corp., together with a sample of the imported merchandise, marked plaintiff's exhibit 1, as well as the record in the case of *F. F. G. Harper* v. *United States*, protests 365975–G, etc., 67 Treas. Dec. 893, T.D. 47729, received in evidence over the objection of counsel for defendant.

Plaintiff's witness Alvin Napack testified that his company has been engaged in the business of importing steel wire and of distributing and selling that product throughout the United States for the past 10 years. During that time, the witness had traveled over the country, in connection with the company's business, and had seen its wire used

many times in Los Angeles, Chicago, Concord, N.H., New York, Washington, D.C., Philadelphia, Hoboken, Dunellen, New Jersey, Dayton, Ohio, Phoenix, Ariz., and other places. The use he had observed was in the baling of bundles of newspapers, waste paper, corrugated boxes and sheets, periodicals, magazines, and other printed matter.

Napack further testified that he had read the record and decision in the case of *F. F. G. Harper* v. *United States, supra;* that he was familiar with the wire therein described, having seen it used many times in the manner in which it was stated to have been used; and that some of the ultimate consumers mentioned by name in the decision were presently customers of his firm. It was his opinion that the wire was similar to his importation, except for the size and weight of the coil and the diameter. The wire in the decided case ranged in diameter from 12 to 15 gauge and was imported in coils weighing from 100 to 150 pounds, whereas the merchandise at bar is 18½ gauge, in 60-pound coils. The witness also stated that plaintiff imports wire ranging in diameter from 15 to 18½ gauge, and that, as the gauge decreases, the thickness of the wire increases.

According to this witness, such wire is used in a wire-tying machine for the purpose of baling bundles of newspapers, waste paper, corrugated boxes and sheets, periodicals, magazines, and other printed matter. To the best of his knowledge, there are but two types of wire-tying machines used in this country, the Gerrard and the Signode, both operating on the following general principles:

\* \* \* The wire is inserted through a threading device into the machine. The bundle is then baled with this wire and compressed, and the wire is placed around the bundle under tension. The wire holds the tension, thus compressing the bundles.

\* \* \* \* \* \* \*

\* \* \* and at the same time permitting the operator of the machine to make a tie and cut the wire.

The bundle thus produced would range in height from 15 to 30 inches and would be under some degree of compression.

Mr. Napack further described the instant wire as an open hearth (low carbon) steel, annealed, having a tensile strength of 32 to 38 British long tons per square inch and an elongation of approximately 14 per centum.

Thomas Willard Parker, testifying on behalf of defendant, stated that he is assistant product manager of United States Steel Supply Division (formerly Gerrard Steel Strapping Division) of the United States Steel Corp., in charge of round steel strapping. He had previously served the company as territory salesman and district packaging representative, for, successively, the West and the Midwest, and, in his

present position, he was in charge of country-wide operations. As a result of his experience and knowledge, he was thoroughly familiar with the Gerrard strapping or tying machines, the mechanics and function of which he described as follows:

The purpose of the round steel strapping machine is twofold: First, to tension a piece of round strap or wire strap around an object, then the second function is to join the ends together, thereby securing the strap around the object to be tied. In doing this, the principle of * * * the closure is merely to twist the wires around themselves three complete times, or in some cases, four times. Also, in doing this, with our round steel strapping, it is necessary to comply with certain Federal rules or American Association of Railroad rules as to the strength of the joint closure as versus strength of the strapping material itself. In doing this with a machine * * * there are * * * two metal portions called yokes that hold the wire a certain distance apart and then the twisting action occurs between these metal portions that prevent the wires from twisting along the length. The distance of the joints itself is pertinent to the strength of the wire material as well as to the efficiency or the strength of the joint itself; all based of course, on the strength of the strapping material.

In these operations, the Gerrard strapping machine can, and does, use an 18½-gauge wire, and his company sells wire of that gauge for the purpose. But the machine has never been known as a baling machine and does not use baling wire.

According to this witness, the ultimate object of the machine is to apply tension to secure the package in transit, without effecting any appreciable amount of reduction in volume density. By contrast, he stated that the primary purpose of a baling machine is to effect a substantial reduction in volume density; and that baling machines generally use a soft basic wire of a 50,000- to 80,000-pound tensile strength.

With respect to the Signode tying machine, the witness testified that it is known in the trade as a Signode-Parker wire-tying machine, that it is both automatic and semiautomatic, but that neither model is equipped to use 18½-gauge wire, such as plaintiff's exhibit 1.

Defendant's witness Harold Christopher testified that he is assistant manager of the New York sales district of the American Steel and Wire Division of United States Steel Corp. While he had no formal education beyond that of high school, except for a short-term executive development course at Cornell University, he had attended numerous training courses sponsored by the company and conducted at its mills to learn the technical aspects of its various products. In all, this division of United States Steel Corp. manufactures over 15,000 different items, including all forms of wire, nails, fence, bars, electrical cables, reinforcing mesh, tacks, etc.

This witness stated that his company sells baling wire throughout the country, which, to his knowledge, would be 14¼ gauge, uncoated,

low or medium high carbon wire, made to a tensile strength of 50–70 thousand pounds per square inch, with a minimum elongation of 12 per centum in 10-inch lengths. It is furnished in rewound coils to fit the mechanisms of the various baling machines on the market. As far as he knows, no other company supplies a different gauge wire for baling machines, since a 14½-gauge standard was agreed upon in the trade.

Mr. Christopher further testified that his company makes and sells a wire like plaintiff's exhibit 1, which is used in substantial tonnage to tie steel reinforcing forms to hold them at a given space during the pouring of concrete, and also in the manufacture of bag ties.

Robert V. Misar, the last witness for defendant, is also employed by the American Steel and Wire Division of the United States Steel Corp. He had been with the company in various capacities, especially selling, since 1914, his activities having been confined to the east coast area. He was also the secretary-treasurer of the New York State Hay and Grain Dealers Association from 1943 to 1946. It was his opinion that an 18½-gauge wire, such as plaintiff's exhibit 1, could not be used for the baling of hay, straw, or any other agricultural commodity of that character and that such wire is not sold by his company as baling wire, because it is not heavy enough. As far as he knows, such wire could be used for many purposes of manufacture, as well as for tying purposes, including the tying of pieces of steel to prevent slippage while concrete is being poured.

No useful purpose is here served in dwelling at length upon the facts established in the incorporated case, for the reason that the decision contains a detailed review of the evidence brought out at the trial. It is clear from that review that the merchandise there under consideration was black or galvanized wire of 12 to 15 gauge, used almost exclusively in the Signode baling machine for packaging printed matter, pulp, straw, hair, felt, textile silks, and wearing apparel, etc., and the record confirms the evidence in the instant case that the Signode machine is not geared for wire thinner than 15 gauge.

Under such circumstances, and in view of the admitted gauge of the wire at bar, the evidence taken at the earlier trial has little, if any, direct bearing upon the use of the present merchandise. The significance of the decision to the inquiry with which we are here concerned lies rather in the conclusion that the packaging of printed matter and the other enumerated commodities by wire strapping is a baling process within the contemplation of the provision for wire, commonly used for the baling of hay or other commodities.

Notwithstanding that testimony as to the use of 15 or less gauge wire is not here germane, we are of opinion that the instant record

sufficiently establishes, by a fair preponderance of the evidence, that wire as fine as 18½ gauge, having the properties ascribed to plaintiff's exhibit 1, is commonly used in a wire-tying machine for bundling various commodities, especially newspapers, magazines, and other printed matter. The witness for the plaintiff, who had been in the business of importing and selling wire of different dimensions, had seen his importations used many times for such purposes. Under settled law, his testimony as to the use of the product which his company imports is entitled to great weight. *Klipstein* v. *United States*, 1 Ct. Cust. Appls. 122, T.D. 31120; *United States* v. *The Baltimore & Ohio R.R. Co. a/c United China & Glass Company*, 47 C.C.P.A. (Customs) 1, C.A.D. 719.

Furthermore, in view of the statutory language "commonly used," the burden of the plaintiff was not so great as that assumed by a party having to establish chief use. "The fact of chief use is difficult to prove. It ordinarily entails rather exacting evidence of use throughout the United States and cannot depend upon evidence of use locally." *L. Tobert Co., Inc., and American Shipping Co.* v. *United States*, 28 Cust. Ct. 456, Abstract 56581, affirmed, 41 C.C.P.A. (Customs) 161, C.A.D. 544. Common use implies "only a use which is not infrequent and which is common to everyday observation, but which, nevertheless, may not be the chief use of such an article." *United States* v. *MacNaughton*, 5 Ct. Cust. Appls. 114, T.D. 34166.

It is to be observed that defendant's proof tends to corroborate plaintiff's evidence in respect to a frequent use of the imported wire as a tying substance. The witness Parker, whose entire business career had centered about the distribution and use of Gerrard strapping or tying machines, readily admitted that such machines utilize 18½-gauge wire and that his company sells wire of that gauge for such use. That he did not consider the Gerrard machine to be a baling machine must be weighed in the light of his reference to the baling of hay and other *agricultural* products. It is, in fact, in this sense that counsel for defendant urged that the instant wire is not commonly used for baling.

Yet, the language of the provision is not so limited. It reads, "other commodities," not "other agricultural commodities," and, as interpreted in the *Harper* case, *supra*, embraces such products as printed matter, hides, furs, shingles, waste paper, textiles, etc.

The word "bale" is defined in Webster's New International Dictionary of the English Language, second edition, 1951, as:

1. A large bundle or package of goods for storage or transportation; now, specif., a large closely pressed package of merchandise, bound with cord, wire, or hoops, and usually protected by a wrapping, as of burlap. * * *

We are of opinion that a tightly tied bundle of goods ranging in height from 15 to 30 inches falls within the foregoing definition of a bale and, therefore, that wire commonly used to tie that bundle is wire, commonly used for baling other commodities than hay.

For the reasons stated, the claim of plaintiff that the wire covered by invoices 791 and 795 of entry number 836866, to which the instant protest has been confined, is dutiable at the rate of $\frac{1}{4}$ cent per pound within the provision of paragraph 317 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, *supra*, for wire, commonly used for baling hay or other commodities. All other claims as to this or other merchandise are, however, overruled.

Judgment will be entered accordingly.